## JAMES MEIGGS v. STATE.

No. A-3195. Opinion Filed December 6, 1919.

(185 Pac. 450.)

1. **APPEAL AND ERROR—Reserving Exceptions—Evidence.** Admission of evidence which is not objected and excepted to will not be reviewed on appeal by this court unless it constitutes fundamental error.

2. **TRIAL—Instructions—Curing Error in Another Instruction.** Where an error occurs in an instruction, the mistake may be cured by other instructions given.

3. **APPEAL AND ERROR—Harmless Error.** A judgment will not be reversed by this court unless, upon an examination of the entire record, it appears that a miscarriage of justice has resulted, or a substantial violation of a constitutional or statutory right of the accused has occurred.

*Appeal from District Court, Muskogee County;*
*R. P. de Graffenreid, Judge.*

James Meiggs was convicted of murder and he appeals. Affirmed.

*P. A. Gavin* and *W. E. Disney,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan* and *W. C. Hall,* Asst. Attys. Gen., for the State.

ARMSTRONG, J. The plaintiff in error, James Meiggs, hereinafter called the defendant, was convicted of murder, and in accordance with the verdict of the jury

was sentenced to imprisonment in the penitentiary for life. To reverse the judgment, this appeal is prosecuted.

This is a companion case to that of Henry Welch, 16 Okla. Cr. 513, 185 Pac. 119, recently affirmed by this court. The plaintiff in error, James Meiggs, Louis Berge, and Henry Welch were jointly charged with the murder of W. L. Smoot. A severance was demanded and granted. The plaintiff in error was convicted as a principal upon the theory that he aided and abetted in the commission of the homicide. As the material evidence in each of said cases is practically the same, and as a full statement of the evidence appears in the Welch Case, we deem it unnecessary to recite the evidence except in so far as it tends to show whether or not this defendant was an accomplice of Welch in the commission of said homicide.

The undisputed facts are that about half past 12 o'clock a. m., March 4, 1917, the defendant, Welch, and Berge went together to the colored waiting room in the depot of the Iron Mountain Railway at Ft. Gibson, and there found one Hymer and his wife; Hymer being a night employe of said depot. The defendant searched Mr. Hymer, but did not take anything from his person; Hymer having announced that he had no money. While the defendant was searching Hymer, Berge ordered Mrs. Hymer to hold up her hands and not make any noise. Hymer and his wife then left the depot and went to the room of the deceased, who was also employed at said depot, and informed him of what had happened at the depot. The deceased armed himself with a Winchester shotgun and accompanied Hymer and his wife to the depot. When Hymer and his wife left the depot, they were followed by the defendant, Welch, and Berge. The evidence shows that, when the defendant searched Hymer, he commanded

him to deliver to him what he had upon his person, and that Welch stood within a few feet of Hymer while de-. fendant was searching him. Shortly after deceased, Hymer, and his wife reached the depot, the defendant, together with Welch and Berge, came to said depot. The evidence is in conflict as to what occurred after all of said parties reached the depot just prior to the homicide.

The evidence on the part of the state is that the defendant, Welch, and Berge entered the colored waiting room of the Iron Mountain Depot at Ft. Gibson, and that the deceased asked the defendant if he was the fellow causing the trouble; that he either laid down or dropped his gun, and he and the defendant then engaged in a fight; that Welch, without saying anything to deceased, joined in the fight to aid the defendant, and drew his pistol and shot deceased; that, while the fight was in progress, Hymer endeavored to help deceased by throwing cinders at his assailants, and when Welch fired the fatal shot Hymer fled.

Henry Welch, as a witness for the defendant, testified. that he was marshal of Ft. Gibson on the night of the homicide, that he had in territorial days been convicted of the murder of Smoot. Witness testified that, after he killed Smoot, he denied that he knew who killed him; that. during the difficulty in the colored waiting room he had not announced that he was marshal or that he was an. officer; that the first time he went to the depot on the night of the killing he was in search of a negro alleged by the defendant to have struck defendant, and whom the defendant did not know; that the second time he went to the depot that night he was endeavoring to find Hymer and the woman who had been with him, neither of whom he knew at the time, to ascertain who they were and what business they had out so late at night; that, so far as he

knew, neither he, Berge, nor the defendant had entered into any agreement to, or intended to, commit robbery that night; that when the defendant was searching Hymer, he discovered that he was a white man and told defendant to let him alone and pulled defendant away from Hymer; that on his second coming to the depot that night he heard a noise in the colored waiting room, and upon entering it was confronted by a man with a long gun who said he would kill him; that he did not recognize the man who afterwards turned out to be Smoot, whom he had known some five or six years; that he twice ordered the man to drop the gun, which he did not do, and, thinking that the man intended to shoot him, drew his pistol and fired one shot; that immediately thereafter, and without ascertaining the result of said shot, he quickly left the depot and ran after Hymer, who had run from the depot; that the defendant did not have any knowledge that he (witness) intended to shoot Smoot, or have any connection with the killing of Smoot.

The defendant testified that he was "pretty full" the night Smoot was killed; that prior to the shooting he went to Garland's Drug Store, met Welch, and informed him that he had been struck by a negro; that Berge, Welch, and defendant then went to the place where defendant had been struck by the negro, found it closed, and proceeded to the Iron Mountain Depot, looked in the window, and saw in the colored waiting room the bulk of a man; that he went into the room and began searching the man, thinking he was a negro; that Welch came up and said, "Let him alone, he is a white man," and pulled him away; that the man and the woman who was with him then left the depot and went uptown, and Berge, Welch, and defendant followed them, but lost sight of them and returned to the depot, Welch in front and defendant following;

defendant heard a noise in the colored waiting room and started in; just as he got inside of the door, some one hit him, and he did not remember for half a minute what happened; that when he recovered from the lick, and just as he started toward the east door, he heard Welch say two or three times, "Put down that gun," and some one said, "I will kill you"; about that time a shot was fired, and the next thing he remembered the man, whom he has since ascertained was Hymer, ran out of the depot and up the street followed by Welch, who hollered to him to stop; that he discovered that he had lost his hat, and went back to find it, and was present when, immediately thereafter, the body of Smoot was found; that he had known Smoot for several years; that they were good friends, and when he went to the depot the second time he was looking for the man he had searched and the woman with him; that Welch was sober, and he (defendant) was drunk; that he remembered some things that happened that night and some he did not remember; that he had never had his hands on the shotgun and had never seen anybody with it.

Upon further direct examination, Hymer testified that, after he saw Welch and defendant fighting Smoot just before the shooting, he did not hear any one say, "Drop that gun," or hear any one say, "I will kill you," and that, just before the shot was fired, he was probably ten feet away from Welch and the defendant and did not see any one with a gun.

The errors assigned and argued in defendant's brief are:

"(1) The court erred in permitting the state to impeach witness Welch on a collateral matter.

"(2) The court erred in giving the seventh and eighth instructions.

"(3)   The evidence is insufficient."

Counsel earnestly insisted that the court committed error in permitting the impeachment of witness Welch on a collateral matter over the objection and exception of the defendant and to his substantial prejudice.

We have carefully examined the record as to the evidence complained of, and find that the same was admitted without objection by the defendant and its admission not excepted to, and therefore, even if its admission was error, such error was not fundamental, and will not be reviewed by this court on appeal.

It is urged that the court committed reversible error in giving instructions numbered 7 and 8. On careful examination of those instructions, we find that, considered together, they fairly state the rule of law applicable and, although not above criticism, contain no prejudicial error sufficient to warrant a reversal of the judgment.

Counsel argued objections to the said instructions 7 and 8. However, no new questions were presented, and a lengthy discussion of the assignments would serve no good purpose. We would not be warranted in reversing the judgment rendered by the trial court unless the record clearly disclosed—which it does not—that a miscarriage of justice had probably resulted, or that the accused had been deprived of some substantial statutory or constitutional right by the giving of said instructions. Section 6005, Rev. Laws, 1910.

It is next insisted that the verdict of the jury is not supported by any evidence, and that therefore a reversal should follow. We are unable to agree with this contention. The proof was sufficient to warrant the jury in con-....ing that the defendant was acting in concert with his

codefendant, Welch, and that the homicide grew out of the attempted execution upon the part of the accused and his codefendant of the joint purpose to commit a felony by robbing the Iron Mountain station, and that, while in the attempted execution of this purpose, the deceased, Smoot, was killed by them.

A careful reading of the record cannot but leave an unbiased mind with an abiding conviction that the verdict of the jury was righteous and in all things lawful. Under the laws of this jurisdiction, the jury are the  judges of all questions of fact, and when there is any evidence reasonably tending to support their finding, and their finding is approved by the trial court, a reversal cannot be had on the ground that the verdict is contrary to the evidence. Section 5873, Rev. Laws 1910.

The jury are not compelled to believe the testimony of any witness, whether the witness is contradicted or not. This and all propositions arising out of the evidence introduced before them are to be determined exclusively by them under proper rules of law laid down by the trial court. In the exercise of their broad discretion, the jury are entitled to disregard any evidence on either side which in their judgment is unworthy of belief and to reach any conclusion which reasonably or legitimately can be drawn from the proof, and their finding under such circumstances will not be disturbed on appeal. This doctrine has too often been laid down by this court to be misunderstood or to require citations of authority.

After a careful consideration of the entire record, we find no errors sufficient to warrant a reversal of the judgment of the trial court. It is therefore affirmed.

DOYLE, P. J., and MATSON, J., concur.