[No. 23817. Department One. August 8, 1932.]

NETTIE SIMMONS, *Appellant*, v. JOHN L. ANDERSON
et al., *Respondents.*

VERA I. RONAN, *Appellant*, v. JOHN L. ANDERSON
et al., *Respondents.*[1]

*Wright & Wright, Padden & Moriarty,* and *Elmer E. Pettingell,* for appellants.

*Harroun, Robinson, Maloy & Shidler,* for respondents.

PARKER, J.—These personal injury damage actions were separately commenced in the superior court for King county. The plaintiffs, Mrs. Simmons and Mrs. Ronan, separately seek recovery of damages for personal injuries claimed as the result of the negligence of the defendant Anderson in the maintaining of his

[1]Reported in 13 P. (2d) 73.

landing dock from and to which as a common carrier he ferried pedestrian and vehicle traffic across Lake Washington. Mrs. Simmons and Mrs. Ronan being injured in the same accident and the question of Anderson's negligence and their contributory negligence with reference thereto being substantially the same, the actions were consolidated for trial. The trial proceeded accordingly in the superior court sitting with a jury. At the conclusion of the evidence introduced in behalf of Mrs. Simmons and Mrs. Ronan, counsel for Anderson, by appropriate motion, challenged the sufficiency of the evidence to sustain any recovery by either of them; which motion was by the court sustained. Final judgment of dismissal was accordingly entered, from which Mrs. Simmons and Mrs. Ronan have appealed to this court.

At the time in question, Anderson maintained as a common carrier a ferry service across Lake Washington. The westerly shore landing was at the easterly terminus of Madison street, in Seattle. The vehicle traffic was driven from the dock upon the ferry at the level of the lower deck of the ferry; while the pedestrian traffic went upon the ferry from an upper floor of the dock onto the upper deck of the ferry. It is the upper floor of the dock and the apron therefrom with which we are here concerned. On that floor were a ticket office and a waiting room, and also a considerable open floor space where pedestrian passengers waited for the ferry which left the dock many times each day, one of which was timed to occur at about two o'clock in the afternoon. From this open space there extended easterly for a distance of some twelve feet a passageway, the floor of which included an apron, along which the passengers passed onto the upper deck of the ferry.

The passageway, including the apron, was some eight feet wide. The apron, at the time in question, was on the same level as the permanent floor of the passageway, and had the appearance of·being a fixed part of that floor, according to the testimony of Mrs. Simmons and Mrs. Ronan. The apron was so held in place by chains fastened to its outer corners outside the railing and extending up to posts on each side of the passageway, some seven or eight feet above the floor, just under the eaves of the roof of the passageway and outside the enclosing walls of the passageway, which walls extended nearly to the inner edge of the apron. There were wooden railings on each side of the passageway extending a few feet from the solid walls of the passageway to the inner edge of the apron, and there were iron pipe railings on each side of the apron in line with the wooden railings.

The floor of the apron was apparently not materially different from the permanent, fixed floor of the passageway. A person walking out through the passageway, even to the extreme end of the apron, could not observe as to what support was underneath the passageway, including the apron. There was maintained clear across the westerly end of the passageway a picket gate which, when closed, separated the passageway from the open space, but which, when open, gave to the passageway an appearance of being part of the open space for waiting passengers. Indeed, when the gate was clear open, a casual observer would likely not notice any gate being there.

On July 10, 1930, Mrs. Simmons and Mrs. Ronan, while waiting to become passengers on the two o'clock ferry, with a view of crossing the lake, walked out through the passageway upon the apron, the gate being clear open, when one of the chains broke, causing one side of the apron to fall and throw both of them into

the lake, resulting in both of them being injured; for which they seek recovery in these actions.

Mrs. Ronan testified, in part, as follows:

"My home is in Los Angeles, California. I was visiting Mrs. Simmons in Seattle. On the afternoon of July 10, 1930, in company with Mrs. Simmons I was going to Kirkland. After disembarking from the street car, we walked across the street and onto the sidewalk that leads onto the dock. Our purpose in going onto the dock was to buy tickets to cross the lake to Kirkland. We discovered the door of the waiting room was locked, and there was no attendant there. We strolled around the dock and looked at the water. We did not see a ferry coming, although we were under the impression that it would come at two o'clock. We were there at approximately 1:30 o'clock. I did not see any gate on the dock or recall seeing any fence whatever. I do know there was no gate closed across the passageway. After trying the door of the waiting room, we walked out to the far end. There was nothing that hindered our progress in walking directly out into the passageway. We walked to the easterly end of the dock and stood there a few minutes looking across the lake. There was no difference in the appearance of the passageway going out there than the rest of the platform, so we walked out there. There were no signs or indication or any warning not to walk out there. We could not see and did not know that the end of the passageway was unsupported. It looked all the same to me, and I did not know that there was no piling under it or that it was any different from the rest of the dock, or that it was any less capable of supporting people than the rest of the dock. As we walked out, we could see that a boy was out at the end diving, and that there were some children below. Another boy ran up the dock. He did not have to open any gate, but just ran out on the passageway because it was open all the time that we were there. We walked out on the end of the passageway, and it collapsed, and it went down with Mrs. Simmons, a boy and myself. This was the first time I had ever been on the Madison street dock."

Mrs. Simmons testified, in part, as follows:

"I have lived in Seattle since 1907. On the tenth day of July, in company with Mrs. Ronan, I went to Lake Washington. I was entertaining her, as she was from out the state. We went to the lake with intention to take the ferry across Lake Washington from the Madison street dock. We were there about a half hour before the accident happened. It was our intention in going out upon the dock to become passengers on the ferry that was going across the lake to Kirkland. We tried the door of the waiting room. There was no attendant about the dock at the time. We walked around back and forth, waiting for the boat; walked out to watch the little boys diving. As we were walking back and forth, we observed the passageway was all open, without any gate or obstruction across it. There were no signs or indications or signals or barriers of any kind across the passageway. The passageway, as I saw it, did not differ in any way from the rest of the dock. In the course of our walk we walked right through and onto the passageway. When we walked out there, there was a boy on the apron, and he was there when the dock fell. It seemed to me that just as soon as I stepped onto the apron it went down, my weight, I suppose. When we were walking out there, I could not see under the apron in any way and could not tell whether there were piles under it or whether it was hanging in the air. I did not see those chains. At the time I was walking out to the apron, there was nothing that indicated or told me that the apron was any different from the rest of the dock."

These quotations are from the evidence as abstracted by counsel in narrative form.

The challenge to the sufficiency of the evidence to support recovery by Mrs. Simmons and Mrs. Ronan was rested upon the ground of failure of proof of negligence on the part of Anderson, and also on the ground of conclusive proof of contributory negligence on the part of Mrs. Simmons and Mrs. Ronan. The trial court seems to have ruled in favor of Anderson

on both of these grounds, though that is not clear. Counsel for Mrs. Simmons and Mrs. Ronan here contend that the court erred in so ruling. We have, we think, sufficiently summarized the controlling facts as the jury would be warranted by the evidence in viewing them. We are of the opinion that the leaving of the gate open rendering the passageway open to the passengers, apparently as part of the open space, and the condition of the apron, apparently as part of the fixed portion of the floor of the passageway, as testified to by Mrs. Simmons and Mrs. Ronan, called for the submission of the question of Anderson's negligence to the jury. We are also of the opinion that it should not be decided as a matter of law that Mrs. Simmons and Mrs. Ronan were guilty of negligence contributing to their injury.

No case has come to our attention quite like this. In the text of 4 R. C. L. 1226, we read:

"Railroad companies are bound to keep in safe condition all portions of their platforms and approaches thereto to which the public do or would naturally resort, and all portions of their station grounds reasonably near to the platform, where passengers, or those who have purchased tickets with a view to take passage on their cars, would naturally or ordinarily be likely to go. Within these boundaries a defect of structure which is likely to or does cause injury, or any other trap or pitfall producing a like result, will fasten a liability on the railroad owing the duty."

This general statement of the law, we think, is equally applicable to the maintenance of docks by common carriers by water transportation. Observations made in our own decision in *White v. Seattle, Everett etc. Nav. Co.*, 36 Wash. 281, 78 Pac. 909, 104 Am. St. 948, lend some support to our conclusion here reached. See, also, 40 Cyc. 917. We conclude that both the question of Anderson's negligence and the question of the con-

tributory negligence of Mrs. Simmons and Mrs. Ronan were questions of fact for the jury to decide.

The judgment of dismissal is reversed, and the cause is remanded to the superior court for further proceedings.

TOLMAN, C. J., MITCHELL, HERMAN, and STEINERT, JJ., concur.