[No. 24591. Department Two. May 23, 1934.]

NETTIE SIMMONS, *Individually and as Executrix, Respondent,* v. JOHN L. ANDERSON *et al., Appellants.*

VERA I. RONAN, *Respondent,* v. JOHN L. ANDERSON *et al., Appellants.*[1]

*Harroun, Maloy & Shidler,* for appellants.

*Wright & Wright, Padden & Moriarty,* and *Elmer E. Pettingell,* for respondents.

[1] Reported in 32 P. (2d) 1005.

GERAGHTY, J.—We have here two separate actions, consolidated for the purpose of trial. The plaintiffs in both cases were injured in the same accident, occurring at a dock maintained by the defendants on Lake Washington near the foot of Madison street, in Seattle. The cases have already been before us in *Simmons v. Anderson,* 169 Wash. 165, 13 P. (2d) 73. On the first trial, the lower court, at the close of plaintiffs' evidence, sustained a challenge to its sufficiency, and judgment was entered dismissing the actions. The lower court was reversed, and the cases remanded for retrial. The second trial resulted in a verdict for plaintiffs. The defendants appeal from a judgment thereon.

The appellants maintained a ferry for transporting passengers and vehicles from the dock here involved to Kirkland, on the opposite side of Lake Washington. The ferry made hourly trips, and on the day of the accident, July 10, 1930, had left the dock at one-thirty P. M. It was due to return at two-twenty P. M.

Shortly after the departure of the ferry, the respondents came upon the dock, intending to take passage on the next ferry for Kirkland. The dock proper was somewhat out from the shore, and was approached by a trestle. It had two floors, the lower used by automobiles in reaching the lower deck of the ferry, the upper for passenger traffic. There was a stairway on the south side, leading from the lower to the upper floor. On the upper floor there was maintained a ticket office and waiting room, as well as a large uncovered open space to accommodate passengers waiting for the ferry. At the time of the accident, the ticket office and waiting room were locked.

From the southeast corner of the open space, there extended easterly for some distance a passageway, and beyond this an apron, both the same width—about eight feet. The passageway and apron were on a level

with the floor of the dock. The passageway out to the apron was guarded by a wooden railing; the apron by a railing of iron pipes, in line with the wooden railing. The apron was supported by chains fastened to its outer corners, extending up over posts on either side of the passageway, and then passing down to a winch. It was hinged at the westerly end, so that it could be raised or lowered to the level of the ferry deck. Outside the apron was a slip, which the ferry boat entered for loading and unloading. A picket gate some five or six feet high was maintained across the entrance to the passageway, and separated it from the open waiting space on the dock. This gate was opened from the south by pushing it across the passageway to the north. For keeping it closed, the gate was equipped on the outer or lake side with a hasp, kept in place by an iron peg in a staple.

The respondents testified that, while waiting for the next ferry, they occupied their time walking about the dock, and saw boys swimming in the water below and diving from the outer end of the apron. The passageway was open and.to all intents and purposes, as far as they could see, part of the dock. They walked through it and out on the apron to watch the boys dive. They did not know of the existence of the gate—it was fully open across the passageway—and they did not know that the apron was without support from underneath. Mrs. Ronan went upon the apron first, followed by Mrs. Simmons. The apron gave way, and they were thrown into the water, some fifteen or twenty feet below, sustaining the injuries for which they sued. It appears that one of the supporting chains broke, allowing one side of the apron to drop down at an acute angle.

At the second trial, appellants, to meet the burden cast upon them by respondents' case in chief, intro-

duced evidence tending to show that, when the ferry left the dock, the gate was secured by closing and bolting the hasp; that several boys were swimming around the dock; that one or more of them climbed from the water on to the lower floor, went up the stairway to the upper floor, climbed around to the outer side of the gate, and, releasing the hasp, opened it. No employee of appellants was on the dock at the time, and the opening was done without their knowledge or consent.

Appellants assign as error the denial of their motions for a directed verdict and for judgment notwithstanding the verdict.

In passing upon the first appeal, we held that the passageway and apron being open to passengers on the dock, apparently as part of it, called for the submission of the question of appellants' negligence to the jury, citing 4 R. C. L. 1226:

"Railroad companies are bound to keep in safe condition all portions of their platforms and approaches thereto to which the public do or would naturally resort, and all portions of their station grounds reasonably near to the platform, where passengers, or those who have purchased tickets with a view to take passage on their cars, would naturally or ordinarily be likely to go. Within these boundaries a defect of structure which is likely to or does cause injury, or any other trap or pitfall producing a like result, will fasten a liability on the railroad owing the duty."

We held the law as above stated equally applicable to the maintenance of docks by common carriers in water transportation.

The appellants urge that they overcame the force of the respondents' case in chief by uncontroverted testimony showing the gate was opened by mischievous boys, for whose acts they were in no way responsible, and which they were not bound to an-

ticipate. We think there are two answers to this contention. In the first place, it was for the jury to find when and how the gate was opened. There were several inconsistencies and discrepancies in the testimony, which raised an issue of credibility to be passed upon by the jury.

The quartermaster of the ferry at the time of the accident, but not in the employ of appellants at the time of the trial, testified that, on this occasion, he did what he always did, closed and fastened the gate. He had no distinct recollection, but knew that he had done it, because it was his routine job to do so. The purser, an employee of the appellants at the time of the trial, testified that he saw the quartermaster close the gate. He had been in the employ of the appellants for twenty years, and it can be gathered from his testimony that, like the quartermaster, it was based upon routine, rather than a definite recollection.

Jack Wesley, a boy fourteen years old at the time of the accident, testified that he had been swimming near the dock since eleven o'clock in the morning; that, shortly before two o'clock, he went up the stairway from the lower to the upper floor of the dock, and, climbing around the gate, released the hasp and opened it. Another boy followed him. He had seen for an hour before this boys going upon the dock and diving off the apron. He further testified that the gate was closed after he went through; that it was closed when respondents approached it; and that they themselves opened it when they went out on the apron. This, of course, was in direct conflict with respondent's testimony. The jury evidently did not believe the boy's testimony that the respondents opened the gate, and, having disbelieved him in this, they might very well have disregarded the rest of his testimony. A

newsboy who testified that the quartermaster locked the gate did not see him do it, but assumed he must have locked it; he heard him lock it.

Another witness testified that he arrived at the dock about one-thirty, shortly after the ferry left; that he saw the boys open the gate, and that they did not shut it, as they testified, but left it open about one or two feet; that the respondents were on the dock when the boys went through the gate, and that when they walked through it was about half open. This testimony was in conflict with that of the respondents, as well as with that of the boys.

We think the trial court rightly ruled that it was not warranted in holding, as a matter of law, that appellants had conclusively established the manner in which the gate was opened.

"The jury is the sole judge of the credibility of the witnesses and of the weight to be given to their testimony, and in passing upon the testimony of any witness the jury has the right to take into consideration the interest that any such witness may have in the result of the trial, the manner of testifying, the former life or conduct and the addiction to immoral habits of any such witness, as shown by the evidence, in determining the credibility of such witness and the weight to be given to his testimony. *State v. Gaul,* 88 Wash. 295, 152 Pac. 1029. Since it is the exclusive province of the jury to pass upon the credibility of the witness, under rules laid down by the court, the jury may accord to the testimony such weight as it deems proper, even though the testimony be uncontradicted and not directly impeached, and may exercise its judgment and discretion in this respect to the extent of wholly disregarding the testimony where there are facts or circumstances, admitted or proved, which tend to establish the untruth of such testimony. *Wainscott v. State,* 8 Okla. Cr. Rep. 590, 129 Pac. 655; *Meiggs v. State,* 16 Okla. Cr. Rep. 557, 185 Pac. 450." *State v. Foley,* 174 Wash. 575, 25 P. (2d) 565.

"Appellants assert that this evidence is undisputed and therefore controlling. The jury was not bound by it as uncontradicted evidence, nevertheless. As interested testimony, the jury could reject it, draw inferences from all the existing circumstances, and accept other evidence even though interested. The weight and credibility of the testimony of the parties, whether interested or not, were for the jury to determine. The jury found against appellants." *Nearhoff v. Rucker,* 156 Wash. 621, 287 Pac. 658.

See, also, *Bice v. Bice,* 138 Wash. 598, 244 Pac. 1000; *Elliott v. Seattle Chain & Mfg. Co.,* 141 Wash. 157, 251 Pac. 117; *Settles v. Johnson,* 162 Wash. 466, 298 Pac. 690; *Macon Consol. St. R. Co. v. Barnes,* 113 Ga. 212, 38 S. E. 756; *Kennedy v. Modern Woodman of America,* 243 Ill. 560, 90 N. E. 1084, 28 L. R. A. (N. S.) 181.

 It was also for the jury to say whether, under all the circumstances, the appellants had taken such precautions as a reasonable and prudent person would take to secure the gate in such manner as would prevent its being opened in the casual way and with the ease developed by the testimony. The apron was maintained on a level with the rest of the dock, and, but for the gate, would be, to all intents and purposes, a part of it, and open to passengers coming there on appellants' invitation. They were charged with a duty to passengers to keep the dock and its appurtenances in a reasonably safe condition. Whether the manner of fastening the gate, upon a dock maintained adjacent to a park and bathing beach frequented by large numbers of children and others during the summer months, met this duty, was a question of fact for the jury. The trial court took this view of the law, and submitted the question of reasonable care to the jury.

"It may be true, as matter of fact, that the acts of care and precaution which ordinary prudence would suggest, and which would be regarded by a jury as reasonable under circumstances indicating little danger, might be regarded as entirely inadequate under circumstances which would disclose the employment of dangerous agencies involving great danger to life and valuable property; but, in all cases and under all circumstances, it is for the jury to determine the character and the extent of the danger involved, and the amount of care and caution which reasonable care requires in guarding against such danger. The quantum or amount of care required to measure up to 'reasonable care' under the circumstances of each particular case is a matter peculiarly within the province of the jury. The quantum of care, the safeguards to be used, the precautions to be observed, the care and foresight to be exercised in each case, must be as variable as the facts involved in different cases are various. It is not practicable for a court to fix and declare as a matter of law the quantum of care or the degree of care that should be exercised under the conditions and circumstances peculiar to any special case; that duty rests with the jury to be performed under proper instructions from the court." *Union Traction Co. v. Berry,* 188 Ind. 514, 121 N. E. 655, 32 A. L. R. 1171.

"The court below adopted this theory and instructed the jury as follows:

" 'The jury are instructed that if they find from the evidence that the defendant negligently failed to provide and maintain proper and secure fastenings to its elevator door, and by reason thereof the door was open at the time of the alleged accident, and that while so open and while the elevator was in the upper part of the building, the plaintiff, while in the exercise of ordinary care, fell into the elevator shaft and was injured; and if such accident was reasonably to have been apprehended from the condition of the elevator door and its fastenings and of insufficient and inadequate light, then the plaintiff will be entitled to recover a verdict at your hands for such damages as

he may have sustained. And under such circumstances it is wholly immaterial whether such door was opened by some third person or not, provided that such accident could not have happened but for the negligence of the defendant in keeping and maintaining the fastening to its elevator door.'

''Counsel for appellant contend that notwithstanding the exclusion of this conversation, they had the right, under the evidence introduced, to have the question of the interference of a third party submitted to the jury; and that, if the jury should have found that the door was opened by Thorne, such act would constitute an efficient intervening cause that would relieve defendant from liability, although it had been negligent in maintaining suitable fastenings as alleged.

''We think the court below, in the instruction above quoted, correctly stated the law applicable to this case. It was the duty of defendant in operating the elevator in question, to exercise the utmost care and diligence, and to provide and maintain proper and secure fastenings to the doors opening into the elevator way that could not be opened or controlled from the outside. Therefore the court was correct in saying that it was 'wholly immaterial whether such door was opened by some third person or not, provided that such accident could not have happened but for the negligence of the defendant in keeping and maintaining the fastenings to its elevator door;' for, had it performed its duty in the premises, such interference by a third party would have been impossible; hence its negligence necessarily concurred in, and constituted an essential factor in, causing the injury.'' *Colorado Mortgage & Investment Co. v. Rees,* 21 Colo. 435, 42 Pac. 42.

See, also, *Alaska Treadwell Gold Mining Co. v. Mugford,* 270 Fed. 753.

We are aware that in *Cole v. German Savings & Loan Society,* 124 Fed. 113, 63 L. R. A. 416, the circuit court of appeals for the eighth circuit declined to follow the doctrine announced in *Colorado Mortgage*

*& Investment Co. v. Rees, supra;* but, notwithstanding this respectable dissent, we are disposed to follow the doctrine of the Colorado case, as being correct in principle and finding abundant support in the decisions of the highest courts of many states.

The appellants cite *Anderson v. Northern Pacific Ry. Co.,* 88 Wash. 139, 152 Pac. 1001, L. R. A. 1917F, 1020. We think the facts in that case are not parallel with the facts here. There, the brakeman securely locked the rear door of the last coach on an excursion train. On the rear platform was a rubber hose with an angle cock connecting with the air pipe line. A young man, a passenger on the train, produced a pass key which fitted the lock, opened the door, and with other young men went out on the platform. One of them turned the angle cock, causing a sudden stop, which broke the train just as a passenger was in the act of stepping from one coach to another. He fell between the coaches and was killed. We held that, in securely locking the rear door, the railway company had done all that it could do to forestall interference with the air line, and was not responsible for the unauthorized act of a passenger.

Let us suppose. that the facts in that case were that the rear door had been locked to protect passengers against danger from a structural defect in the rear platform, not apparent to the naked eye, that the door had been unlocked in the manner disclosed by the evidence, that a passenger, without knowledge of the circumstances, had walked out upon the platform and that it gave way, throwing him upon the track; such state of facts would be comparable, except for the secure locking of the door, with the facts in the case at bar. If such had been the facts in the *Ander-*

*son* case, we apprehend the conclusion of the court on the issue of law involved would have been different.

The jury having found, as we have a right to assume they did, under the court's instructions, either that the gate was not opened in the manner contended for by appellants, or that, if so opened, the appellants failed in the degree of care they owed to passengers invited upon their dock, our decision upon the first appeal is controlling as the law here.

The judgment of the trial court is affirmed.

BEALS, C. J., BLAKE, TOLMAN, and HOLCOMB, JJ., concur.