[No. 29558. *En Banc.* October 26, 1945.]

S. J. O'BRIEN, *as Assignee, Appellant*, v. PUGET SOUND PLYWOOD, INC., *Respondent*.[1]

*L. L. Thompson,* for appellant.

*John T. McCutcheon* and *DeWitt C. Rowland,* for respondent.

BLAKE, J.—Charles A. Morisette brought this action to recover damages for alleged breach of a contract of employment. Answering the complaint, defendant, by way

[1]Reported in 165 P. (2d). 86.

of affirmative defense, alleged that plaintiff had been discharged for good and sufficient cause.

Upon the trial, plaintiff established without dispute that, under the provisions of the contract, he would have received $7,856.17 during the remainder of the term subsequent to his discharge, and that during such period he earned $533.57.

The jury returned a verdict in favor of the plaintiff for eighteen hundred dollars. Plaintiff interposed a motion for judgment notwithstanding the verdict in the sum of $7,322.60—the difference between the amount that he earned subsequent to the breach of the contract and the amount he would have received had he not been discharged. The court denied the motion and entered judgment on the verdict. Plaintiff assigned the judgment to S. J. O'Brien, who appears as appellant in this court.

Appellant contends that, since the jury, in returning a verdict for Morisette, of necessity found that he had been wrongfully discharged, and, since there was no dispute in the evidence between the amount he would have earned under the terms of the contract and the amount he actually earned, he was entitled, as a matter of law, to recover the difference. This contention is based upon a principle stated as follows in *City Bond & Share v. Klement*, 165 Wash. 408, 411, 5 P. (2d) 523:

"If a general verdict is returned, and the amount which should have been found is a matter of mere computation and over which there is *no controversy*, the court may amend. But the court cannot, under the guise of amending a verdict, invade the province of the jury or substitute his verdict for theirs."

Were the question of wrongful breach of the contract by defendant the only issue presented by the record, appellant's position would be invulnerable. But such is not the case.

The record as made presents an issue as to whether Morisette exercised reasonable diligence in an effort to obtain other employment in order to mitigate his damage.

Instructing the jury with respect to damages, the court, in separate instructions, stated:

Instruction No. 12. "If you determine there was a breach of said contract by defendant, then it was the duty of the plaintiff . . . to make a diligent effort to secure other like or similar employment to mitigate any damage he may have sustained by reason of the alleged breach."

Instruction No. 13. ". . . If you find from the evidence in this case that the contract of employment . . . was terminated by defendant without just cause, then your verdict . . . should be for the sum of $7,856.17, less whatever sum the plaintiff actually earned. . . . Should you find for the plaintiff, you are instructed that in no event can your verdict . . . exceed the sum of $7,322.60."

Instruction No. 16. "If you find for the plaintiff . . . you will insert [in the form of verdict] . . . the amount which under the evidence you will find him entitled to, . . . "

■ No exceptions were taken to these instructions, so they became the law of the case. Reading them together, it is clear that the court intended to, and did, submit the issue of mitigation of damage to the jury. For, in substance, they say: If you find that defendant wrongfully breached the contract, you shall return a verdict in favor of the plaintiff for $7,856.17, less whatever sum he actually earned, *provided you find that he exercised reasonable diligence in an effort "to secure other like or similar employment to mitigate any damage he may have sustained by reason of the alleged breach."* (Italics ours.)

■ Appellant contends that the burden was upon respondent to show that Morisette could, by reasonable diligence, have obtained other employment and so mitigated his damage.

Conceding this to be the rule, it is not applicable to the issue as presented in this case, for Morisette tried his case upon the theory that the burden on the issue was upon him. From the instructions we have quoted, it is apparent that the court submitted the case to the jury on that theory. Appellant is not at liberty to adopt a different theory on the

issue in this court from that presented at the trial. *Sylvester v. State,* 46 Wash. 585, 91 Pac. 15; *Paine v. Port of Seattle,* 70 Wash. 294, 126 Pac. 628, 127 Pac. 580. In the former case, it was said, p. 595:

"Lastly, the appellants object to the sufficiency of the answer filed on behalf of the state, contending that it contains an admission that the state holds the land in question subject to forfeiture in case it ceases to use it for a capitol site. We do not so read the answer, but if it required that construction it would not alter the appellants' position. The case was tried in the court below as if upon sufficient pleadings, and we must consider it upon the same theory in this court. To do otherwise would be to deny to the respondent the benefit of the statutes relating to amendments."

■ Apparently recognizing this to be the case, appellant urges that respondent offered no evidence on the issue. Even so, it does not follow that the issue was not one for the jury. For a party may, by his own testimony, establish an element of his adversary's case—as in personal injury cases where the defense of contributory negligence is frequently, if not usually, established by the plaintiff's testimony standing alone.

So, here, we think, Morisette, by his own testimony, presented the issue of mitigation of damage and made it a question for the jury. On *direct* examination, he testified:

"Q. After you ceased to work for the defendant corporation, I wish you would state with some particularity what efforts you made to engage in some business after May 1st. A. After May 1st, first I felt then I probably would take a little rest. I think it was a few weeks I worked around the garden at home, studying out just exactly what I wanted to do because my former employer had sold the mill and it was in the form of reorganization at that time. Of course, I was working for myself and I thought the best thing would be to start off for myself so I made a number of trips to Oregon to line up the situation, knowing that the logs were more available in Oregon than they were in Washington. I did quite a little preliminary work for myself trying to line up what possibilities there would be for me to get started in Oregon where the bulk of the timber was. I made numerous trips there sizing up the setup and

talking to lumber brokers and lumber products men and trying to make myself out a line on what I wanted to do. Each time I returned home, my home is here, of course, and I went to Seattle to visit a very personal friend of mine I used to do business with, considerable, and he said, 'Charley, I would very much like to have you help me here a month or so, I am in quite a jam and you could help me out.' I told him I would do that if I could go whenever I wanted to because I had to make trips to Oregon and conditions were such that I wanted to start business there myself. That if I could be relieved quickly it would be all right, so I helped him six weeks or a month.

"Q. How much did you receive from him? A. I received $242.00 for the time I worked for him. Q. That was on a daily basis? A. Yes, sir. Q. How much a day did you get? A. About $9.00 a day. Q. State whether or not you also had any tentative negotiations with him regarding the possibility of going into business with him? A. Yes, while I was there he said, 'Charley—,' he had arranged prior to see me to arrange to possibly go in the jobbers' trade and contacted me to see if I would be interested in going into the jobbing business with him. Of course, I had the Oregon deal on and I was kind of on the fence; I wanted to go into business with him, which he agreed to, and he said it would take a little time to get started and if I wanted to be there with him it would be all right until we got going. I was trying to line up whether to go in with him or go to Oregon.

"Q. Did anything eventuate from that discussion? A. It slightly fell through. One reason why, materials were a little harder to get and I explained to him that possibly it was not the right time, we did not time ourselves correctly, but he wanted me very badly. Q. About when did the negotiations fall through? A. The latter part of August, around there, I think. Q. In 1942? A. Yes, sir. Q. After that what did you do regarding any other business or employment? A. Well, I felt my Oregon setup was the next best thing so I made arrangements to go down to Oregon again and still line it up to see what could be done to line up the business. Every time I went it looked more promising. I was staying at the hotel for quite a while so I got me a room and stayed there. Q. What part of Oregon? A. Eugene and Cottage Grove, Oregon. Q. Did you set up an office there? A. Yes, at that time at Cottage Grove, Oregon. Q. About when? A. It was the latter part of September, something around there. Q. 1942? A. 1943.

"Q. Yes; why did you leave this area and go to Oregon?

A. Well, Cottage Grove is a very small city and living facilities are very hard to get. Q. Why did you leave this area and go to Oregon? A. Because of the logging situation, I thought it was much easier and you could get lumber more readily. It was more available I thought because really the larger manufacturers are going into Oregon after logs today. I felt eventually, after the war, some of these firms would not get materials. That is the reason I went to Oregon.

"Q. How long did you operate this brokerage business in Cottage Grove? A. Oh, I just moved from Cottage Grove; it is three weeks that I moved ago. Q. Was your business very successful from the standpoint of producing revenue? A. I was very much enthused. Q. But, was your business very successful from the standpoint of producing revenue? A. Truthfully, no, because I put in so much expense at missionary work and lumber was hard to get so I had to contact these mills to see what lumber would be available for me to get. Q. What were your gross receipts, without making any allowance for expenses, from the first of May, 1942, to the first of June— or rather, of 1943? A. From the first of May, 1943, to the first of June, 1944? Q. Yes, including the $242.00 that you received from the man in Seattle? A. $533.57. Q. That is your total earnings? A. Yes, sir.

"Q. You were not very successful in getting in very much money there; what facts do you attribute that to? A. Well, it took me three months of that to start, from the latter part of September, October, November, and December, and part of January, going to the mills, and lumber is very critical, and being a stranger down there it was hard to receive materials. I started receiving materials along about the latter part of January and February. Of course, it took some time to ship them. Of course, when I did I received the business and shipped in January, February, March and April.

"Q. Now, you have recently closed your office in Cottage Grove and moved to Eugene; when did you do that? A. Three weeks ago. Q. Why did you do that? A. Well, the housing facilities were very bad and Eugene is more or less of a broker's outlet and I started to make a broker's business, a broker's business for Southern Oregon. Q. Have you got an office in Eugene? A. Well, I maintain it at home. Q. You had an office at Cottage Grove? A. Yes, sir."

Charles I. Reberger, a former president of the respondent, and its witness, testified that Morisette had stated in his presence at a committee meeting that he

". . . had three jobs . . . offered him that would pay him three times as much money as he was making there . . . but he was not going to take any of those as he was going to prove that he had a contract."

██ Upon this testimony the jury were fully warranted, under the instructions of the court, in finding that Morisette failed to exercise reasonable diligence to find "other like or similar employment to mitigate any damage he may have sustained." That they did so find is manifest from the amount of their verdict. That they might, or should, have denied him any recovery is beside the issue, since the respondent did not challenge the verdict.

██ Respondent served, and filed, a brief characterized as "Respondent's Additional Authorities," against which appellant has directed a motion to strike. The motion is granted, for the so-called additional authorities is, in essence, an argument in answer to appellant's reply brief.

Judgment affirmed.

BEALS, C. J., STEINERT, ROBINSON, and MALLERY, JJ., concur.

MILLARD, J. (dissenting)—Charles A. Morisette, who had a written contract of employment for a definite term with defendant corporation, was discharged by his employer prior to expiration of the term of employment. Morisette instituted an action against defendant to recover damages alleged to have been sustained in the amount of $7,322.60, from the date of discharge to a fixed date prior to the date of trial. The defense to the action was that the employee was discharged for cause. Trial of the cause to the court sitting with a jury resulted in verdict for eighteen hundred dollars in favor of plaintiff. Plaintiff's motion that judgment notwithstanding the verdict be entered in his favor in the sum of $7,322.60 was denied and judgment was entered on the verdict.

On his motion therefor, S. J. O'Brien, to whom plaintiff had assigned the judgment, was substituted as party plaintiff in the action in the place of Charles A. Morisette. The assignee has appealed from the judgment for the purpose

of obtaining an order directing the trial court to vacate the judgment for eighteen hundred dollars and substitute in lieu thereof a judgment in favor of the assignee in the sum of $7,322.60.

Counsel for appellant contends that as there was no evidence contrary to the evidence adduced by appellant's assignor of the damages sustained, and that, as the determination of the amount of damages was merely a matter of mathematical computation, the trial court should on motion of appellant have made such computation and entered judgment of $7,322.60. It is argued that the only conflict in the evidence was whether Morisette was discharged for cause and that the verdict of the jury foreclosed that question in favor of Morisette; that is, the jury found that the discharge of Morisette from his employment was unlawful.

The uncontradicted evidence is that, if the employment had not been terminated, Morisette would have received from his employer $7,856.17; and that, during the period he was unemployed, he was able to earn only $533.57. The difference between what he could have earned and what he did earn was $7,322.60. The defense to the action was that the employee was discharged for cause, but respondent did not offer any evidence to show that after his discharge the employee could have earned more than he did during the period in question or that he did not exercise diligence in seeking other employment.

If the jury found that the discharge of Morisette was unlawful, the measure of damages is the amount of his salary under the contract reduced by whatever sums the discharged employee had, or with the exercise of reasonable diligence could have, earned from the time of his discharge to the date of expiration of his contract. *Hansen v. Columbia Breweries*, 12 Wn. (2d) 554, 122 P. (2d) 489.

The burden is upon the defendant in actions of the character of the one at bar to prove that the plaintiff might have earned additional compensation during the period between the date of discharge and the expiration of the contract of employment. 35 Am. Jur. 493, § 60. See, also, list of authorities in 134 A. L. R. 257 to 269, inclusive.

The question whether the contract was unlawfully terminated by respondent is foreclosed in favor of appellant by the verdict of the jury. There was no issue of fact as to the amount of damages sustained. The evidence is undisputed that the amount of wages lost under the contract, less the earnings of the discharged employee, is $7,322.60. The evidence that Morisette sought other employment after his discharge by respondent was not controverted.

*Simmons v. Anderson,* 177 Wash. 591, 32 P. (2d) 1005, (cited by the trial court and respondent) in which we held that even if evidence be uncontradicted and not directly impeached, a jury may disregard it where there are facts and circumstances admitted or proved which tend to establish the untruth of such evidence, is not in point as there is an entire absence of facts or circumstances admitted or proved which tended to establish lack of diligence upon the part of Morisette in seeking other employment. The only evidence was that Morisette, like Hansen in *Hansen v. Columbia Breweries, supra,* was unsuccessful in his quest for employment. It will be remembered that, in the case cited, judgment in favor of Hansen was affirmed by this court.

It was the position of appellant, in *Hansen v. Columbia Breweries, supra,* that the discharged employee could not recover because he made no attempt to mitigate his damages by securing other employment. The evidence was that Hansen unsuccessfully made every effort to obtain employment. The trial court in the case at bar incorrectly concluded that the jury had the right *without any evidence* to speculate concerning the degree of diligence which Morisette should have exercised in order to mitigate damages. The record is such that the court would not have committed error in instructing the jury that the only question for the jury to determine was the question of wrongful discharge. Under the rule enunciated in *Richey & Gilbert Co. v. Northwestern Natural Gas Corp.,* 16 Wn. (2d) 631, 134 P. (2d) 444, the fact that no request was made for such an instruction does not alter the situation where, as we held in the case cited, a general verdict is returned and the amount which should have been found is a matter of mere compu-

tation and over which there is no controversy, the court may amend the verdict. It would not have been an invasion of the province of the jury or the substitution of the court's verdict for that of the jury to have amended the verdict, as the amount which should have been found under the evidence is a matter of mere computation and over it there was no controversy.

The rule is well settled that the measure of damages in an action of the character of the one now before us is the contract price, salary or wages, reduced by whatever sums the discharged employee had, or with the exercise of reasonable diligence could have, earned from the time of his discharge to the period of the expiration of the contract. 35 Am. Jur. 482-484. See, also, *Hansen v. Columbia Breweries, supra.*

The burden is upon the defendant to show that the plaintiff might have earned additional compensation during the period between the date of discharge and the expiration of the contract of employment. If the plaintiff is discharged after the time the service commenced, he has an immediate cause of action for damages which are *prima facie* a sum equal to the stipulated amount unless the defendant gives evidence in mitigation of damages.

"A demand for damages is, as in any other action for breach of contract, a prerequisite to a valid declaration, complaint, or petition for breach of an employment contract, but it is not necessary to entitle the plaintiff to recover damages necessarily ensuing from nonperformance or breach, for him to detail these expressly in his complaint. And since prima facie the measure of recovery is the contract price, salary, or wages for the unexpired part of the term, the burden is upon the defendant to rebut this presumption by proof that the damages sustained were actually less. The plaintiff in suing for damages for breach of contract may, by way of anticipating any defense on the ground of failure to reduce or minimize damages, allege that he made reasonable efforts to avoid or lessen the injuries, but he is not required to do so. Accordingly, the plaintiff in an action for breach of a contract of employment has been held under no obligation to allege and prove inability to procure other employment. While there are some cases indicating

it to be the duty of the plaintiff to make a prima facie showing in this respect, the general rule is that in an action for alleged wrongful discharge, he is not bound to show affirmatively as a part of his case that other employment was sought and could not be found, but may rest in his case upon proof of the contract of service, its breach, and damages which are determined by the contract price for services. If the employer desires to mitigate damages by showing that the employee had employment or could have obtained employment by reasonable diligence during the whole or any portion of the contract, the burden rests upon him to establish such fact." 35 Am. Jur. 493-494.

If Morisette was entitled to any damages the amount was $7,322.60. Respondent offered no evidence in mitigation of damages. On the record made in the case at bar, the ascertainment of this sum was merely one of mathematical calculation, and, as the jury found in his favor on the only litigated issue, the trial court not only had the power but it was its duty to make this mathematical calculation and enter judgment in the amount of $7,322.60.

Morisette established the fact that he was unlawfully discharged. He was under no obligation to mitigate damages by seeking employment substantially different from that covered by his contract, and he was not required to depart from the locality covered by his contract and seek employment in some other area.

We find no evidence in the record challenging the accuracy of appellant's recital of the evidence.

"*Prima facie*, the plaintiff is damaged to the extent of the amount stipulated to be paid. The burden of proof is on the defendant to show either that the plaintiff has found employment elsewhere, or that other similar employment has been offered and declined, or, at least, that such employment might have been found. I do not think that the plaintiff is bound to show affirmatively, as a part of her case, that such employment was sought for and could not be found. (2 Greenl. on Ev., § 261, a; *Costigan v. M. and H. R. R. Co.*, 2 Den., 609.)

"No such evidence having been offered by the defendant, the plaintiff should recover the whole amount of her stipulated compensation as the damages attributable to the defendant's breach of contract. This, as has been seen, is the

true measure of damages." *Howard v. Daly,* 61 N. Y. 362, 371, 19 Am. Rep. 285.

The argument of respondent that the burden was shifted by reason of the fact that the complaint alleged diligence is without merit. There is no evidence that Morisette found similar employment elsewhere, that similar employment was offered to him and declined or that such employment might have been found.

The jurisdiction of the court to entertain a motion of the character of the one made by appellant is unquestioned. We so held in *Richey & Gilbert Co. v. Northwestern Natural Gas Corp.,* 16 Wn. (2d) 631, 134 P. (2d) 444, which follows a series of opinions of this court commencing with *Casety v. Jamison,* 35 Wash. 478, 77 Pac. 800. That case was followed by *Buffington v. Henton,* 70 Wash. 44, 126 Pac. 58, which was approved in *City Bond & Share v. Klement,* 165 Wash. 408, 5 P. (2d) 523. Other opinions of this court are to the same effect; that is, the rule is that where the amount of recovery is liquidated and there is no conflict in the evidence, the court may compute the damages notwithstanding the verdict of the jury.

I cannot agree that the verdict of the jury was a compromise verdict for the reason that the jury was misled by instructions which respondent now urges were inconsistent. Respondent argues that instruction No. 13, the pertinent part of which is quoted in the majority opinion, is inconsistent with instruction No. 12, which charged the jury that if it determined there was a breach of the contract by respondent, then it was the duty of appellant to make a diligent effort to obtain like or similar employment to mitigate any damages he might have sustained by reason of the alleged breach. It is insisted that the presumption is conclusive that the verdict was the result of this inconsistency. Instruction No. 13 was requested by appellant and instruction No. 12 was requested by respondent.

I can see no inconsistency in the two instructions. Instruction No. 13 plainly charged the jury that if it found for the appellant the verdict should be for the sum of $7,856.17,

less whatever sum appellant actually earned during the period of time he was unemployed and that in no case could the verdict exceed $7,322.60. Instruction as to the maximum amount was merely given to obviate error in calculation which would produce more damages than warranted by the evidence, and there is nothing in the entire instruction which nullifies the specific portion of the instruction.

No exception was taken to respondent's requested instruction No. 12, hence respondent may not indirectly urge error in the giving of that instruction because if there was error it was invited. The instruction was simply a discussion of an abstract principle of law. The jury was not instructed that it should offset against damages, sums which Morisette might have earned or anything of that character. It is not a sound argument that, conceding *arguendo,* instruction No. 12 should not have been given, and that had appellant moved for a new trial, the motion should have been granted because of the giving of that instruction, the verdict, from which respondent has not appealed, is a compromise verdict.

"The scope of an instruction in a particular case, whether civil or criminal, is to be determined not alone by the pleadings therein, but also by the evidence in support of the issues; and even though an issue is raised by the pleadings, it is not proper to give an instruction thereon where there is no basis for it in the evidence. An instruction not based on the evidence is erroneous in that it introduces before the jury facts not presented thereby, and is well calculated to induce them to suppose that such state of facts in the opinion of the court is possible under the evidence and may be considered by them." 53 Am. Jur. 455-456.

Requested instructions based upon assumption and not upon evidence should be refused.

"It is error to give an instruction on a state of facts which there is no evidence tending to prove, or which the undisputed evidence in the case shows does not exist, even though such instruction contains a correct statement of the law." 144 A. L. R. 1403.

The scope of an instruction in a particular case is to be determined, not alone by the pleadings therein but also by the evidence in support of the issues between the parties,

and, even if an issue is raised by the pleadings, it is improper to instruct thereon although it may be abstractly correct, where there is no basis for it in the evidence. The principle upon which this rule is founded is that only such an instruction should be given as is based upon the legitimate evidence in the case. The fact that it may be correct as a general principle of law is not material, for it is the duty of the court to confine itself to a statement of such principles of law as are applicable to the evidence received in support of the contentions of the parties, and thus to aid the jury in arriving at a correct determination of the issues involved. 14 R. C. L. 786-790.

The rule that in order for a party to take advantage of an error committed by the trial court in giving instructions or refusing requested instructions, he must make a proper objection and save his exception, is not applicable in the case at bar. It is true that an appellate court will not consider, in the absence of a proper exception, an instruction which is erroneous because there is no evidence to support it. It should be borne in mind, however, that where there is neither evidence or reasonable inference from the evidence to justify the verdict, which is the situation in the case at bar, motion for judgment notwithstanding the verdict should be granted.

The trial court is vested with the authority, and upon it is imposed the duty, of granting a motion for judgment notwithstanding the verdict when the evidence and all the inferences which the jury could justifiably draw therefrom would be insufficient to support a different finding. The correctness or the incorrectness of the instructions is of no moment. The only evidence in the case that Morisette sought to mitigate the damages was the testimony of Morisette which sustained his complaint. While he was under no legal obligation to do so, Morisette alleged he endeavored to find other employment and his testimony established the fact that during the period he was unemployed he earned $533.57. His evidence was not controverted and there was no issue of fact on which the court could properly instruct the jury as to the amount of damages sustained.

The question whether Morisette was unlawfully discharged by respondent is foreclosed in his favor by the verdict of the jury.

In *Simmons v. Anderson, supra,* we held that even if evidence be uncontradicted and not directly impeached, a jury may disregard it where there are facts and circumstances admitted or proved which tend to establish the untruth of such evidence. In the case at bar, there is an entire absence of facts or circumstances which tend to prove Morisette's lack of diligence in seeking other employment.

The judgment should be reversed and the cause remanded with direction to the trial court to enter a judgment in favor of appellant in the amount for which he prays.

SIMPSON, JEFFERS, and GRADY, JJ., concur with MILLARD, J.

---

[*En Banc.* January 7, 1946.]

Petition for modification of opinion denied.

MILLARD, J. (dissenting)—Appellant petitions this court to strike from the majority opinion the following language:

"Charles I. Reberger, a former president of the respondent, and its witness, testified that Morisette had stated in his presence at a committee meeting that he 'had three jobs . . . offered him that would pay him three times as much money as he was making there . . . but he was not going to take any of those as he was going to prove that he had a contract.' "

or, in the alternative, if the language quoted be retained in the majority opinion, that we expressly declare we have overruled, giving our reason therefor, *Hansen v. Columbia Breweries, Inc.,* 12 Wn. (2d) 554, 122 P. (2d) 489.

The petition should be granted or the cause should be reheard by this court and the judgment reversed.

It is insisted in the dissenting opinion that there was no evidence contrary to the evidence adduced by appellant of the damages sustained, and that there was an entire ab-

sence of facts or circumstances admitted or proved which even tended to establish lack of diligence upon the part of Morisette in seeking other employment.

The contract on which recovery is sought was executed February 18, 1942. The contract provided that, at the expiration of three years (February 18, 1945), the parties would mutually agree on the compensation to be paid thereafter. The conversation upon which the majority opinion is bottomed could not have been later than January or February, 1943, at which time Reberger was "appointed on a committee to discuss with the Morisette boys their situation there." (See p. 103 of statement of facts.) The Morisette brothers after that discussion with the committee refused to consent to any change in their contract. March 22, 1943, a month or so subsequent to the discussion, respondent mailed to the two brothers a notice of termination of the contract as of May 1, 1943. The Morisette brothers notified respondent in writing of their refusal to accede to respondent's demand and stated that, if respondent insisted upon such dismissal, respondent would be held liable in damage. On May 1, 1943, the two brothers left respondent's employ.

One unfamiliar with the record in the case at bar would assume that Reberger's testimony was an admission against interest made by Morisette after the termination of the contract. If the alleged statement had been made after termination of the contract, Reberger's testimony would have been admissible. It is clear that the conversation was at least two months prior to respondent's cancellation of the contract. (See pp. 103-106, statement of facts.)

There is no evidence, nor reasonable inference from evidence, that Morisette failed to exercise reasonable diligence in seeking employment after he was discharged by respondent. He was under no obligation to mitigate damages by seeking employment substantially different from that covered by his contract, and he was not required to depart from the locality covered by his contract and seek employment in some other area. There is no evidence that Mori-

sette was offered any position after termination of his contract with respondent.

"It is true, as shown by the record, that appellant's agent did secure an offer of a position for respondent with an advertising agency, which was refused by respondent. However, the offer was made previous to the discharge, and there is no evidence that the position was open after appellant had discharged respondent.

"At the time the position was offered to respondent, he was working for appellant and had no notice that he was to be discharged. At that time he had suffered no damage because of any action on the part of appellant, hence he was under no duty to accept or attempt to secure other employment." *Hansen v. Columbia Breweries, Inc.*, 12 Wn. (2d) 554, 122 P. (2d) 489.

Had this court more carefully read the record and followed, as it should, the rule enunciated in *Hansen v. Columbia Breweries, Inc., supra,* it would not have disregarded the following argument in appellant's reply brief and held that Morisette was under any duty to accept or attempt to obtain other employment prior to termination of his contract with respondent:

"We further wish to controvert the statement on page 33 that respondent defended among other things on the ground that the Morisette brothers 'had not fulfilled their duty to mitigate the damages.' This statement is incorrect. Neither by pleading or proof was any such evidence offered. Apparently the basis for the contention was the testimony of Reiberger, a former president of respondent, and one Alskog, secretary for the respondent, whose testimony is referred to on page 38. Reiberger testified that two or three months before the discharge of these two brothers that he was on a committee which sought to induce them to modify their contract and that Charles Morisettte then stated to him that he had three offers for jobs which would pay him $1,000.00 per month (R. S. F. pp. 103-106). Alskog testified that sometime before the termination of this contract Al Morisette stated to him that he could do better outside than at the plant, and that Charles Morisette said that he could do just as well (R. S. F. p. 118).

"It will be seen that both of these statements, if they were ever uttered, simply related to the optimistic views which the two brothers had as to their ability to secure other em-

ployment should their contract be terminated. Certainly this was no evidence that when they were subsequently discharged, then because they did not secure the positions which they had previously thought they could secure, that they therefore failed to mitigate their damage. The materiality of this evidence is completely answered by the decision of this court in *Hansen vs. Columbia Breweries*, 12 Wash. (2d) 554, 122 Pac. (2d) 489, where in the defense of an action for a breach of a contract of employment the defendant sought to introduce evidence showing that, previous to the servant's discharge, the defendant had secured and offered to the servant other employment of a similar character which had been by the servant refused. The court held this evidence immaterial, stating:

" 'At the time the position was offered to respondent, he was working for appellant and had no notice that he was to be discharged. At that time he had suffered no damage because of any action on the part of appellant, hence he was under no duty to accept or attempt to secure other employment.'

"Here there is no evidence that there were any such positions offered to the brothers after they were discharged, or indeed that they had ever been offered to them before the date of the discharge, as was the situation in the *Hansen* case. The *Hansen* case distinctly establishes the rule of law that there is no duty upon the servant to mitigate damage until his contract of employment has been terminated. This seems clear, since there must first be damages before the question of mitigation can arise."

A rehearing should be granted.

SIMPSON, J., concurs with MILLARD, J.