IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39780-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER A.P. FINN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — A jury found Christopher Finn guilty of five felonies and one misdemeanor. On appeal, Mr. Finn challenges his convictions for count 3, second degree assault, and count 5, harassment. He further asserts the State committed misconduct during witness testimony and during its closing argument, and argues the victim penalty assessment (VPA) was improperly ordered.

We affirm Mr. Finn's convictions and remand for the limited purpose of striking the VPA.

BACKGROUND

The State charged Mr. Finn with three counts of second degree assault (counts 1-3), fourth degree assault (count 4), harassment (count 5), and first degree unlawful possession of a firearm (count 6). The State further alleged Mr. Finn used a firearm while committing the crime of harassment.

These charges arose between March 11 and 12, 2021, in an apartment shared by Mr. Finn, Kimberly Irvine, and their young daughter and son.[1] Ms. Irvine was playing with their son on the evening of March 11. The child was teething, causing his mouth to bleed. Mr. Finn became angry when he noticed the blood because he thought Ms. Irvine had either punched the child or was playing too rough.

After the children were bedded down later that evening, Mr. Finn began yelling at Ms. Irvine about their son's teeth. Mr. Finn pushed, punched, and choked Ms. Irvine as he yelled at her. During the altercation, Ms. Irvine pushed Mr. Finn off her and, in the process, broke a pendant he was wearing around his neck.

Around midnight, Ms. Irvine apologized to Mr. Finn about the broken pendant and attempted to calm him down. In response, Mr. Finn retrieved a survival knife and told

---

[1] The facts are primarily adopted from Ms. Irvine's trial testimony, as transcribed in the report of proceedings spanning October 19-21, 2022. Mr. Finn's testimony either directly contradicted Ms. Irvine's testimony or he denied committing the acts alleged by the State.

Ms. Irvine he was going to sleep with it under his pillow. As the two were sitting on opposite sides of their bed, Mr. Finn pointed the knife at Ms. Irvine, about one or two feet away from her head. Ms. Irvine left the bedroom as Mr. Finn yelled and swore at her.

The next day, Mr. Finn made an unsuccessful attempt at repairing the pendant, causing him to become angry. Mr. Finn's anger was also based on Ms. Irvine confronting him about communicating with other women through a dating application. Mr. Finn retrieved his Glock handgun and placed magazines for the gun on the kitchen counter. Mr. Finn then held the Glock at his side and threatened to kill Ms. Irvine and their children. Ms. Irvine was concerned for their children's safety because Mr. Finn had been consuming alcohol and was very angry. Later that day, Mr. Finn punched and choked Ms. Irvine, dealing injuries to her face and head. Ms. Irvine eventually went to the hospital for her injuries and spoke with police officers. Mr. Finn was later charged by the State.

The charges were tried to a jury. Following trial, Mr. Finn was found guilty of all six counts. The jury further found the assaults and harassment were committed against a family or household member, and that Mr. Finn committed the second degree assaults with a deadly weapon. However, the jury did not find the firearm enhancement related to the harassment charge. Mr. Finn was ordered to serve a prison sentence, 18 months of community custody, and pay a VPA.

Mr. Finn appeals.

ANALYSIS

Mr. Finn presents four arguments on appeal: (1) there was insufficient evidence to support a conviction for second degree assault in count 3; (2) the State committed misconduct during witness testimony and closing argument; (3) the jury instruction for harassment lacked the subjective intent element required for a true threat; and (4) the VPA was improperly ordered. We affirm Mr. Finn's convictions but remand for the limited purpose of striking the VPA.

SUFFICIENCY OF EVIDENCE FOR SECOND DEGREE ASSAULT IN COUNT 3

Mr. Finn argues the State presented insufficient evidence to support a conviction for second degree assault as charged in count 3. Specifically, Mr. Finn claims the State failed to prove he intended to use the knife to create reasonable fear and apprehension of bodily injury in Ms. Irvine, evidenced by Ms. Irvine neither feeling threatened with the knife nor fearful that she would be stabbed. We disagree.

The due process clause of the Fourteenth Amendment to the United States Constitution requires the prosecution to prove beyond a reasonable doubt every fact necessary to constitute the crime charged. *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). The sufficiency of the evidence is a question of law this court reviews de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence

4

and all reasonable inferences that can be drawn from it." *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

"The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). When analyzing a sufficiency of the evidence claim, all reasonable inferences must be drawn in favor of the State. *Id.* "[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

To convict Mr. Finn of second degree assault, as charged in count 3, the State was required to prove beyond a reasonable doubt that Mr. Finn assaulted Ms. Irvine with a deadly weapon. In part, the jury was instructed that an "assault" is:

> [A]n act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

Clerk's Papers (CP) at 199. The jury was further instructed that "[a] knife having a blade longer than three inches is a deadly weapon." CP at 208.

Precipitating the incident with the knife, Ms. Irvine testified that Mr. Finn "got really mad," "wanted [her] to shut up," pushed her, punched her in the face, and choked her around the throat with both hands until she could not breathe, and "start[ed] to not be

able to see anything." Rep. of Proc. (RP) at 130-31, 134. While being choked, Ms. Irvine testified that Mr. Finn pushed her to the floor, which caused her to hit her head on the bed frame, "start[ed] to have sex with [her]," and told her "to take it like a mare." RP at 131. The "violence, the physical violence" stopped when Ms. Irvine used her legs to push Mr. Finn away, causing a "Thor hammer pendant" Mr. Finn was wearing around his neck to break. RP at 134.

Later, when Ms. Irvine attempted to calm down Mr. Finn and apologize for damaging his pendent, "[Mr. Finn] threatened [her] with a knife." RP at 136. Ms. Irvine then contrarily stated, "he didn't really threaten me with it." *Id*. Ms. Irvine described the knife as a survival knife with an eight- to nine-inch blade. Ms. Irvine testified that Mr. Finn held the knife by her head and "kind of pointed it to [her]" while calling her a "crazy f*****g c**t." RP at 137. Although Ms. Irvine first stated she was not fearful that she would be harmed by the knife, she testified on re-cross-examination that she exited the bedroom, in part, because of the knife.

Antithetical to Ms. Irvine's testimony, Mr. Finn testified his knife was locked away in a safe. Mr. Finn testified it was Ms. Irvine who "took her knife and she put it under her pillow. And she told me she was going to slit my throat while I was sleeping." RP at 320. Mr. Finn testified he had to sleep with one eye open as Ms. Irvine hovered over him, watching him while he slept.

6

Juries are the "'sole judge of the credibility of the witnesses and of the weight to be given to their testimony.'" *Simmons v. Anderson*, 177 Wash. 591, 596, 32 P.2d 1005 (1934) (quoting *State v. Gaul*, 88 Wash. 295, 303, 152 P. 1029 (1915)). When considering testimony, a jury has every right to consider "'the interest that any such witness may have in the result of the trial, the manner of testifying, the former life or conduct, and the addiction to immoral habits of any such witness, as shown by the evidence, in determining the credibility of such witness and the weight to be given to his testimony.'" *Id.*

Considering Mr. Finn's actions in the context of all of the evidence, a reasonable jury could conclude that Mr. Finn intended to place Ms. Irvine in reasonable apprehension and imminent fear of bodily injury by holding a survival knife near her head. The incident with the knife occurred after Mr. Finn had yelled at Ms. Irvine, pushed her, punched her in the face, choked her, pushed her to the floor, and tried to have sex with her. Ms. Irvine then exited the room, in part, due to Mr. Finn's possession of the knife. Moreover, the jury, as the sole judges of credibility, may have believed Ms. Irvine's first statement that "[Mr. Finn] threatened me with a knife" over her contradictory assertion that, "he didn't really threaten me with it." RP at 136.

In viewing the evidence in a light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that Mr. Finn intended to use the knife to create reasonable fear and apprehension of bodily injury in Ms. Irvine. Sufficient

7

evidence supports the jury's guilty finding for the crime of second degree assault as charged in count 3.

PROSECUTORIAL MISCONDUCT

Mr. Finn contends the prosecutor committed misconduct when she misstated the facts during the questioning of Ms. Irvine and when she presented improper arguments during summation. We disagree that the State's questioning and arguments were improper.

Prosecutorial misconduct is grounds for reversal if "'the prosecuting attorney's conduct was improper and prejudicial.'" *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (quoting *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009)). "The defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial." *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).

When examining a prosecutor's alleged misconduct, the improper conduct is not viewed in isolation. *Monday*, 171 Wn.2d at 675. Instead, the conduct is looked at "in the full trial context, including the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" *Id.* (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)). The purpose of viewing the conduct in this light is to determine if the prosecutor's conduct was prejudicial to the defendant, and it will only be viewed as prejudicial when there is a substantial likelihood the misconduct affected the jury's verdict. *Id.* Therefore, when

viewing misconduct, the court should not focus on what was said or done but rather on the effect that flowed from the misconduct. *Emery*, 174 Wn.2d at 762.

If a defendant fails to object at trial to the prosecutor's alleged misconduct, as is the case here, then the defendant is deemed to have waived any error, "unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id*. at 760-61. "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id*. at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2012)).

Mr. Finn argues the prosecutor committed misconduct when she misstated facts during her questioning of Ms. Irvine. His argument is premised on Ms. Irvine's testimony, "Well, [Mr. Finn] didn't really threaten me with [the knife]." RP at 136. Contrary to this testimony, Mr. Finn claims the prosecutor presupposed that the knife was actually used in an aggressive manner during her questioning of Ms. Irvine.

We disagree with Mr. Finn's assertion that the prosecutor misstated the facts during her questioning of Ms. Irvine. Preceding Ms. Irvine's statement that Mr. Finn "didn't really threaten me," she testified, "And he threatened me with a knife." RP at 136. Mr. Finn asks us to accept the truthfulness of Ms. Irvine's later testimony and reject the earlier statement. We decline the invitation.

9

After Ms. Irvine provided conflicting testimony about whether she was threatened by Mr. Finn, the State asked a series of questions to advance and clarify her testimony. To illustrate the acceptableness of the prosecutor's questions, we quote the challenged questions and the relevant portion of Ms. Irvine's responses:

[STATE]: Where was the knife in relation to where you were?

[MS. IRVINE]: It was I was like right - - it was like a foot or two away.

. . . .

[STATE]: Can you describe where the knife was closest to your body?

[MS. IRVINE]: It was by my head.

[STATE]: And I think it seemed like you were - -

[MS. IRVINE]: He kind of pointed it to me, but.

. . . .

[STATE]: What was your, what was your - - what was your feeling when he held a knife up like that and said those words?

[MS. IRVINE]: I was used to him calling me names. So.

[STATE]: Were you fearful that you were going to be harmed by the knife?

[MS. IRVINE]: No.

[STATE]: Did you want a knife pointed at you?

[MS. IRVINE]: No.

[STATE]: Is that conduct that you asked for?

[MS. IRVINE]: I upset him, so.

. . . .

[STATE]: So you've described being strangled, being punched, having a knife held up to you, but you stayed at the residence, the apartment. Can you explain why?

[MS. IRVINE]: Because I loved him. And I always thought it was my
fault.

RP at 136-39.

In reviewing the prosecutor's questions in the context of Ms. Irvine's conflicting

testimony about whether she was threatened by Mr. Finn, the prosecutor did not misstate

the facts. Mr. Finn has failed to demonstrate the State's questioning of Ms. Irvine was

improper. Thus, the prosecutor did not engage in misconduct during its questioning of

Ms. Irvine.

Mr. Finn next asserts the prosecutor engaged in misconduct when she presented

the following arguments during summation:

We've got the defendant putting a knife up to the victim.

. . . .

The mere fact of being close to someone displaying it in aggressive manner
when the words that he said, after he'd already strangled and assaulted her,
that's offensive conduct.

. . . .

In her case, she talked about: Oh, I don't know if he was going to be
stabbed—if he was going to stab me, but he'd already left the room. He'd
already beat her, strangled her. Of course she was fearful that she would be
stabbed.

RP at 422, 431.

During closing argument, the State is permitted "wide latitude to draw and express

reasonable inferences from the evidence." *State v. Mak*, 105 Wn.2d 692, 698, 718 P.2d

407 (1986). Here, the prosecutor's characterization of Mr. Finn's actions can be

11

reasonably inferred from Ms. Irvine's testimony. Importantly, the jury was also instructed that the State's argument was not evidence, and that it was required to rely solely on the evidence in reaching its verdict.

The prosecutor's arguments were not improper. The State did not engage in misconduct during its summation.

SUBJECTIVE INTENT FOR HARASSMENT

Mr. Finn asserts for the first time on appeal that a recent United States Supreme Court decision that altered the mens rea for a true threat is applicable to his harassment conviction. He further argues that the record is ambiguous as to whether the jury would have convicted him of harassment had they been properly instructed on the proper mens rea. The State responds that this issue should not be considered because (1) it is raised for the first time on appeal, (2) the record is not ambiguous, and (3) the error was harmless beyond a reasonable doubt. We agree with the State's second and third arguments.

RAP 2.5(a) allows an appellate court to "refuse to review any claim of error which was not raised in the trial court." The purpose of RAP 2.5 is to both give the opposing party a chance to respond and to allow the trial court a chance to correct the error. 2A KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE RAP 2.5 author's cmt. 1, at 233 (7th ed. 2011). Issue preservation encourages "the efficient use of judicial resources." *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988).

However, issue preservation should not be applied when "four conditions are met: (1) a court issues a new controlling constitutional interpretation material to the defendant's case, (2) that interpretation overrules an existing controlling interpretation, (3) the new interpretation applies retroactively to the defendant, and (4) the defendant's trial was completed prior to the new interpretation." *State v. Robinson*, 171 Wn.2d 292, 305, 253 P.3d 84 (2011).

In 2023, the United States Supreme Court altered the standard of proof for true threats. *Counterman v. Colorado*, 600 U.S. 66, 69, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023). Because Mr. Finn's case was completed prior to the Supreme Court's holding in *Counterman* and is pending on direct review, the constitutional rule announced in *Counterman* applies retroactively to his harassment conviction. *State v. Harris*, 154 Wn. App. 87, 92, 224 P.3d 830 (2010). Mr. Finn has satisfied the *Robinson* criteria; we decline to apply the preservation principles of RAP 2.5.

The due process clause of the Fourteenth Amendment requires the prosecution to prove beyond a reasonable doubt every fact necessary to constitute the crime charged. *Winship*, 397 U.S. at 363. Jury instructions must properly inform the jury of the law. *State v. Gordon*, 172 Wn.2d 671, 677, 260 P.3d 884 (2011). Omitting the required mens rea from the to-convict instruction for a charged crime is akin to omitting an element of the crime. *State v. Schaler*, 169 Wn.2d 274, 288, 236 P.3d 858 (2010). The failure to instruct the jury on every element of a charged crime is an error of constitutional

magnitude.  *Id.*  However, "[i]f a court determines the claim raises a manifest constitutional error, it may still be subject to a harmless error analysis."  *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009).

Prejudice is presumed under the constitutional harmless error analysis. *State v. Anderson*, 19 Wn. App. 2d 556, 564, 497 P.3d 880 (2021).  Thus, we will reverse unless the State persuades us beyond a reasonable doubt that the error did not contribute to the verdict.  *State v. Orn*, 197 Wn.2d 343, 359, 482 P.3d 913 (2021); *State v. Romero-Ochoa*, 193 Wn.2d 341, 347, 440 P.3d 994 (2019).  We place this heavy burden on the State to deter conduct that undermines the principle of equal justice.  *State v. Jackson*, 195 Wn.2d 841, 856, 467 P.3d 97 (2020).

Omitting an element of a crime from a jury instruction "may be harmless when it is clear that the omission did not contribute to the verdict."  *Schaler*, 169 Wn.2d at 288. Stated another way, omitting the proper mens rea from a jury instruction may be harmless when the uncontroverted evidence supports the required mens rea.  *Id.*  Conversely, an "error is not harmless when the evidence and instructions leave it ambiguous as to whether the jury could have convicted on improper grounds." *Id.*

Mr. Finn argues the recent United States Supreme Court ruling in *Counterman* clarified the mens rea of a true threat from the objective reasonable person standard to the subjective standard of recklessness.  600 U.S. at 69.  He asserts that because the jury was

14

not instructed on the subjective standard of recklessness, the error was not harmless

beyond a reasonable doubt.

In *Counterman*, the Supreme Court clarified the mens rea for determining when

speech is protected under the First Amendment and when it falls into the unprotected

zone of a true threat. Prior to *Counterman*, the definition of a "true threat" was:

> To be a threat, a statement or act must occur in a context or under such
> circumstances where a reasonable person, in the position of the speaker,
> would foresee that the statement or act would be interpreted as a serious
> expression of intention to carry out the threat rather than as something said
> in [jest or idle talk] [jest, idle talk, or political argument].

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL

2.24, at 80 (4th ed. 2016). *Counterman* altered this objective reasonable person standard

to a subjective standard of recklessness. *Counterman*, 600 U.S. at 69. Under the

subjective standard, "[t]he State must show that the defendant consciously disregarded a

substantial risk that his communications would be viewed as threatening violence." *Id.*

Here, Ms. Irvine's testimony formed the basis for the harassment charge. Ms.

Irvine testified that Mr. Finn retrieved his Glock handgun and, while holding it to his

side, stated he "wanted to kill every, kill everybody" and "threatened to kill [her] and

[their] children." RP at 149. The trial court instructed the jury on the objective

reasonable person standard for a threat. The court's instruction stated:

> To be a threat, a statement or act must occur in a context or under such
> circumstances where a reasonable person, in the position of the speaker,
> would foresee that the statement or act would be interpreted as a serious

expression of intention to carry out the threat rather than as something said
in jest or idle talk.

CP at 212. This was error under the subsequent holding in *Counterman*. However, the

error was harmless beyond a reasonable doubt as the jury would have reached the same

verdict without the error.

Mr. Finn suggests the jury could have found that he made the threat out of

frustration because he and Ms. Irvine had been quarreling. Appellant's Open. Br. at 41.

Alternatively, Mr. Finn posits that the jury could have found that the threat and his

actions were influenced by his consumption of alcohol. *Id*. However, Mr. Finn never

claimed to have been under the influence of alcohol before the trial court, contrary to his

position on appeal. He also denied being armed with the Glock or threatening Ms. Irvine

or the children. Rather, Mr. Finn testified that he had only drank three beers throughout

the day and that his Glock was stored in his safe. Thus, the jury was tasked with

assessing the credibility of Mr. Finn's testimony against Ms. Irvine's testimony.

There is no doubt Mr. Finn, at minimum, consciously disregarded a substantial

risk that his communications would be viewed as threatening violence to Ms. Irvine.

Ms. Irvine testified that Mr. Finn retrieved his Glock after he had previously pushed her,

punched her in the face, choked her, pushed her to the floor, and held a survival knife

within one to two feet of her head. She testified Mr. Finn lined the magazines up on the

kitchen counter and, while angry and holding his Glock to his side, stated he "wanted to

kill every, kill everybody" and "threatened to kill [her] and [their] children." RP at 149.

Ms. Irvine claimed she was worried Mr. Finn would carry out the threats because "he had

been drinking throughout the day," "was really angry and when he's angry he doesn't, he

kind of just does things. He don't; he don't think about it." RP at 150-51.

The record unambiguously establishes that Mr. Finn possessed the subjective

intent of recklessness. In finding Mr. Finn guilty of harassment, the jury accepted

Ms. Irvine's testimony and disbelieved Mr. Finn's denial of making any threats or

possessing the Glock. Ms. Irvine's testimony substantiates that Mr. Finn consciously

disregarded a substantial risk that his communications would be viewed as threatening

violence. Consequently, the State has shown beyond a reasonable doubt that the trial

court's failure to instruct the jury on the subjective standard for a true threat was harmless

beyond a reasonable doubt.

VICTIM PENALTY ASSESSMENT

Mr. Finn contends that, because he is indigent, the trial court erred when it ordered

the VPA. The State concedes this error. We accept the State's concession.

Former RCW 7.68.035(1)(a) (2018) required a VPA be imposed on any individual

found guilty of a crime in superior court. In April 2023, the legislature passed Engrossed

Substitute H.B. 1169 (H.B. 1169), 68th Leg., Reg. Sess. (Wash. 2023), that amended

RCW 7.68.035 to prohibit the imposition of the VPA on indigent defendants.

RCW 7.68.035 (as amended); LAWS OF 2023, ch. 449, § 1. H.B. 1169 took effect on July

17

1, 2023. Amendments to statutes that impose costs upon convictions apply prospectively to cases pending on appeal. *See State v. Ramirez*, 191 Wn.2d 732, 748-49, 426 P.3d 714 (2018).

Because Mr. Finn's case is pending on direct appeal, the statutory amendment applies. Further, the trial court found Mr. Finn to be indigent at the time of his sentencing. Thus, we remand for the trial court to strike the VPA from Mr. Finn's judgment and sentence.

## CONCLUSION

We affirm Mr. Finn's conviction and remand for the limited purpose of striking the VPA from the judgment and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Cooney, J.

WE CONCUR:

Fearing, J.

Staab, A.C.J.